UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| TOWN OF HEMPSTEAD, and DONALD X. CLAVIN JR., in his official capacity as Town Supervisor,<br><br>          Plaintiffs,<br><br>    - against –<br><br>TRIBOROUGH BRIDGE AND TUNNEL AUTHORITY, METROPOLITAN TRANSPORTATION AUTHORITY, FEDERAL HIGHWAY ADMINISTRATION of the UNITED STATES DEPARTMENT OF TRANSPORTATION, SHAILEN BHATT, in his official capacity as Administrator of the Federal Highway Administration, and RICHARD J. MARQUIS, in his official capacity as Division Administrator of the New York Division of the Federal Highway Administration,<br><br>          Defendants. | Docket No.<br><br>**COMPLAINT** |

---

Plaintiffs TOWN OF HEMPSTEAD and DONALD X. CLAVIN JR. ("Plaintiffs"), by their attorneys Rosenberg Calica & Birney LLP, Special Counsel to Town Attorney for the Town of Hempstead John Maccarone, as and for their Complaint, allege as follows:

  1.  This action is brought to protect the rights and liberties of the employees and residents of the Town of Hempstead, Long Island, New York, among others, from the New York Central Business District Tolling Program, often referred to as the New York City Congestion Pricing Program (the "toll" and "Plan").

  2.  Defendants intend to enact and authorize a toll for entering and operating a motor vehicle south of 60th Street in Manhattan.

{00475979-3}

3. The large-scale zone-based toll Plan is prohibited by federal law and has not been properly authorized. The Federal Defendants reportedly expect to potentially authorize the Plan via an obscure "pilot program" which has not been funded by the United States of America Congress in years, which in no manner applies to the toll and its massive cordoning off of the financial and business capital of the world, is unauthorized and additionally requires direct congressional approval.

4. The Plan is otherwise not a valid toll because there is no rational relationship between the charge made against the driver and the service provided by the government.

5. The toll serves only to tax drivers passing into the Central Business District, constitutes an illegal tax, and violates multiple provisions of the New York State Constitution.

6. The toll/tax is not legal as it treats classes of persons differently for the same activity with no rational basis, in violation of the equal protection of the laws as provided for in the New York State and Federal Constitutions.

7. Furthermore, the disparate treatment of classes of vehicle operators is a violation of vehicle operators' substantive due process rights.

**JURISDICTION & VENUE**

8. This action is brought under the New York and U.S. Constitutions, 42 U.S.C. § 1983, and 23 U.S.C. § 301. The Court has subject-matter jurisdiction over this action under 28 U.S.C. §§ 1331, 1343(a)(3), and 1367.

9. Jurisdiction to grant a declaratory judgment is conferred by 28 U.S.C. §§ 2201 & 2202.

10. Injunctive relief is authorized by Rule 65 of the Federal Rules of Civil Procedure.

11. Venue lies in this judicial district pursuant to 28 U.S.C. §§ 1391(b)(1) and (b)(2).

## PARTIES

12. Plaintiff TOWN OF HEMPSTEAD is a municipal corporation duly organized and existing under the laws of the State of New York.

13. Plaintiff DONALD X. CLAVIN JR. is the Town Supervisor, the elected representative of the residents of the Town, and brings this action on behalf of the Town, its employees and residents. As part of his duties, the Town Supervisor is the official ultimately in charge of compensating Town employees for travel-related expenses incurred. (Collectively, plaintiffs are referred to as the "Town").

14. Defendant TRIBOROUGH BRIDGE AND TUNNEL AUTHORITY ("TBTA"), is a New York State authority, with offices in New York, New York.

15. Defendant METROPOLITAN TRANSPORTATION AUTHORITY ("MTA"), is a public benefit corporation and a New York state authority under New York state law, with offices in New York, New York.

16. Defendant FEDERAL HIGHWAY ADMINISTRATION ("FHWA") is an agency within the UNITED STATES DEPARTMENT OF TRANSPORTATION, with offices in Washington, D.C.

17. Defendant SHAILEN BHATT, is sued in his official capacity as Administrator of the Federal Highway Administration, and defendant RICHARD J. MARQUIS, is sued in his official capacity as Division Administrator of the New York Division of the Federal Highway Administration. (Collectively, defendants the Federal Highway Administration, Bhatt, and Marquis are referred to as "FHWA").

## STATEMENT OF THE CASE

18. In 2019, the New York State Legislature enacted New York State Vehicle & Traffic Law Article 44-c, which authorized the TBTA to impose tolls on travel in the City of New York ("City") by establishing a "Central Business District Tolling Program."

19. The TBTA is an affiliated authority of the MTA.

20. N.Y. Vehicle & Traffic Law § 1701 states that the intent of the congestion pricing is to provide capital funding for mass transit particularly the subways, to reduce vehicular congestion on the roadways, and to protect the public health.

21. N.Y. Vehicle & Traffic Law § 1704 defines the central business district ("CBD") as the "geographic area in the borough of Manhattan south of and inclusive of sixtieth street to the extent practicable but shall not include the FDR Drive, and New York State Route 9A otherwise known as the 'West Side highway' including the Battery Park underpass and any surface roadway portion of the Hugh L. Carey Tunnel connecting to West St."

22. The goals of the Plan are to heavily discourage vehicles from entering Manhattan (aside from Uptown Manhattan above 60th Street) and to generate revenue for the city subway system and other public transportation systems run by the MTA. N.Y. Vehicle & Traffic Law §§ 1701, et seq.

23. According to the MTA, the Plan will have an enormous impact that will completely alter the financial capital of the world:

> The Central Business District (CBD) Tolling Program will be the first congestion pricing program in the United States…. Implementing congestion pricing will dramatically improve quality of life for New Yorkers. Fewer cars in the central business district will reduce emissions and help New York achieve its ambitious climate goals. Less stop-and-go traffic will also be safer for pedestrians and bikers. Drivers who pay the toll will spend less time sitting in traffic, and other vehicles — such as buses or emergency vehicles — will be able to move faster. The program will also raise revenue to fund $15 billion for critical transit projects,

such as upgrading to the signaling system, accessibility improvements, and expanding access to the transit system.

https://new.mta.info/project/CBDTP.

### The Town of Hempstead

24. The Town of Hempstead is located in Nassau County, Long Island, New York, and encompasses (entirely or partially) twenty-two incorporated villages, and as of the 2020 census had a population of close to eight hundred thousand residents. If it were a city, it would be the second largest city in New York State, second only to New York City.

25. The Town is the most populous municipality in the New York metropolitan area outside of New York City. The Town directly borders New York City's Queens County.

26. Being the largest suburban municipality close to New York City, Town residents rely on their proximity to Manhattan below 60th Street, for work, healthcare, shopping, and recreation, and will be severely impacted by the Congestion Pricing Plan.

27. Town employees also regularly travel on official business to Manhattan below 60th Street and the Town is obligated to pay for their travel expenses, including tolls.

28. Travel to Manhattan by public transportation is unfeasible or significantly impractical to many Town residents and employees because of their age, health, safety concerns in terms of crime as well as social distancing, cost (especially by virtue of carpooling), travel time (particularly during non-peak hours), and other reasons.

29. As to commuters alone, U.S. Census figures show that Nassau County has close to 700,000 workers, nearly 70% of whom commute to work by car. American Community Survey of U.S. Census Bureau, 2022 data for Nassau County, N.Y. Additionally, "nearly one third of the employed residents living in Nassau [County]… work in NYC." *The Ins and Outs of*

*NYC Commuting*, NYC Dept. of Planning, p. 35. About thirty-five thousand Long Islanders commute into New York City by car every work day (id. p. 86).

30. The median age of Town residents makes the Congestion Pricing Plan particularly impactful on them because of their need to drive into Manhattan for work and healthcare and their increased inability to use public transportation. Twenty-six percent of the Nassau County population is 60 years old and older (Census Reporter, Nassau County NY) and the median age of the workforce is steadily increasing (U.S. Bureau of Labor Statistics, Employment Projections Data). Lower and Midtown Manhattan also have the highest rates of primary care healthcare providers per capita (Primary Care Dev. Corp., *Primary Care Access in New York City Report, 2019*).

## The Illegal Planned Tolls

31. At present, the Defendants' intent is to charge a toll for drivers whose motor vehicles cross the boundary of the CBD, entering into the CBD from outside the district.

32. There is no plan to toll vehicles based on time in the congestion zone, or distance traveled within the congestion zone or by any other variable measure of contribution to congestion.

33. The toll generates revenues by charging drivers for the use of NYC streets.

34. The toll remains constant, as a per-day charge, regardless of mileage driven or time spent on the City's roadways in the congestion zone.

35. While planning to charge tolls on all vehicles entering the CBD, the TBTA and MTA will not charge a toll for persons who garage their vehicles inside the CBD, drive within the CBD, but do not cross out of and re-enter the CBD.

36. The toll revenues are intended for use by the TBTA and MTA for mass transit capital projects.

37. The TBTA and MTA will use the revenue of the tolling scheme primarily for public transit systems within the City.

38. The MTA has announced that revenue from Congestion Pricing will be used to improve transit. 80% of the money will be used to modernize New York City subways and buses; 10% will go to Long Island Rail Road, and 10% to Metro-North Railroad.

39. Neither the MTA nor the TBTA has announced any substantial service upgrades that would benefit residents of the Town.

40. The claim that there will be less congestion affecting Town residents who enter the CBD is without basis in fact.

41. No part of the toll funds is to be used for the maintenance or upkeep of the City roadways whose use is being tolled.

42. The purpose or effect of the congestion pricing is to penalize drivers for entering into the congestion pricing zone, to deter them from driving into the CBD.

43. It is the intent of congestion pricing to force persons who would otherwise drive into Midtown and Lower Manhattan to take mass transit into that area.

44. Presently, the primary mass transit option in the City, the subway, is so dangerous that the Governor has sent the National Guard into the subway system to provide security.

45. As a part of the security provided, the police and National Guard are requiring mandatory searches of private citizens' bags for the "privilege" of use of the subway, a "privilege" that the Defendants are presently trying to force on the people of the Town by

penalizing other means of entry into and transportation within the City by means of congestion pricing.

46. Many Town residents and employees do not have a reasonable mass transit alternative for entry into Midtown and Lower Manhattan.

47. The congestion pricing toll is a fee upon persons who cross into the CBD.

48. The congestion pricing toll provides no benefit from the MTA or TBTA to the persons against whom the toll is imposed, or the class of persons against whom it is imposed.

49. The congestion pricing toll does not compensate the MTA or TBTA for costs or expenses of services rendered by the City, where the use of City public roads is the basis for the charge.

50. The revenues of the congestion pricing plan are to be used for general improvements for the use of the public at large.

## FIRST CLAIM FOR RELIEF

51. The Town repeats and realleges each of the foregoing allegations.

52. Under federal law, tolls to enter or exit Interstate System highways are prohibited unless a statutory exception to the prohibition applies. 23 U.S.C. § 301; American Trucking Associations, Inc. v. Alviti, 630 F.Supp.3d 357, 368 (D.R.I. 2022). While federal law does provide for a "Congestion relief program" exception allowing tolling (23 U.S.C. § 129), the Plan does not qualify for that exception and has not been claimed to qualify for that exception.[1]

53. Federal law additionally provides for a "Congestion mitigation and air quality improvement program" (23 U.S.C. § 149), but that involves federal funding and not tolls.

54. Additionally, FHWA has not found that § 129 or § 149 authorize the Plan.

---

[1] This is because, among other things, the New York City Central Business District is not an "urbanized area with a population of more than 1,000,000" (23 U.S.C. § 129(d)(1)(A)).

{00475979-3}    8

55. FHWA has contended that the Plan may instead receive federal authorization by being accepted into the Value Pricing Pilot Program ("VPPP").

56. More specifically, FHWA has indicated that the Plan should apply for inclusion in its Value Pricing Pilot Program. June 2023 Finding of No Significant Impact, FHWA as Lead Agency, pp. 1 & 26. While FHWA has made environmental approvals under NEPA, culminating in its recent Finding of No Significant Impact (id.), it has further indicated therein that:

> The Project Sponsors and FHWA will enter into a tolling agreement allowing the Project Sponsors to enter into the FHWA Value Pricing Pilot Program (VPPP).
>
> After completion of all federal requirements, including acceptance in VPPP, tolling operations could commence.

Id. at p. 26.

57. Accordingly, upon information and belief, FHWA has not yet admitted the Plan into the VPPP.

58. FHWA does not possess authority to admit the Plan into the VPPP. Alternatively, if it has already admitted the Plan into the VPPP it did not possess authority to do so.

59. The VPPP is authorized by section 1012(b) of the Intermodal Surface Transportation Efficiency Act of 1991 ["ISTEA"] (Public Law 102–240, 105 Stat. 1914), as amended by the Transportation Equity Act for the 21st Century ["TEA–21"] § 1216(a) (Public Law No. 105–178, 112 Stat. 107). It is published as a statutory note to 23 U.S.C. § 149. See 23 U.S.C. § 149 note.

60. Section 1012(b) of the ISTEA, as amended, provides in relevant part:

> (1) The Secretary shall solicit the participation of State and local governments and public authorities for one or more value pricing pilot programs. The Secretary may enter into cooperative agreements with as many as 15 such State or local governments or public authorities to establish, maintain, and monitor value pricing programs.

…. (3)  Revenues generated by any pilot project under this subsection [this note] must be applied to projects eligible under such title [this title].

(4) Notwithstanding sections 129 and 301 of title 23, United States Code [sections 129 and 301 of this title], the Secretary shall allow the use of tolls on the Interstate System as part of any value pricing pilot program under this subsection [this note]. Id.

61. This legislation is unspecific and imprecise. It leaves completely undefined what it means by "value pricing pilot programs". Whatever it means, nothing in it specifies that the term is so broad as to authorize the dramatic transformation and effective cordoning off of one of the largest cities in the world and all of its financial and business districts, by imposing potentially steep tolls that amount to thousands of dollars per year for each vehicle commuting to the commercial part of Manhattan. Interpreting the VPPP statute as allowing the Plan stretches the law beyond its text and intent.

62. Admitting the Plan into the VPPP will authorize the initially fixed tolls to thereafter be periodically increased, in line with the New York State legislatively expressed intention that the amount of the tolls be high and burdensome enough to significantly dissuade motor vehicles from entering the CBD so as to resolve traffic congestion concerns. See N.Y. Vehicle & Traffic Law §§ 1701, et seq., including § 1704-a. Accordingly, the impact of admitting the Plan into the VPPP is not properly assessed based only on whatever initial heavy tolls the sponsors propose as a means of getting their "foot in the door" and securing federal approval, but on the Plan's stated goal of imposing tolls that will be even higher and more burdensome in future years once the Plan is authorized.

63. This is especially so because the Plan is subject to the Major Question Doctrine, and the vague and terse VPPP statute does not come close to satisfying the Doctrine's requirement of direct and specific congressional authorization for the administrative action.

64. The Major Questions Doctrine is a principle of federal statutory interpretation regarding administrative law, which provides that courts will presume that Congress does not delegate to executive agencies issues of major political or economic significance. As Chief Justice John Roberts summarized in West Virginia v. EPA, 597 U.S. 697 (2022):

> Thus, in certain extraordinary cases, both separation of powers principles and a practical understanding of legislative intent make us "reluctant to read into ambiguous statutory text" the delegation claimed to be lurking there. Utility Air, 573 U. S., at 324. To convince us otherwise, something more than a merely plausible textual basis for the agency action is necessary. The agency instead must point to "clear congressional authorization" for the power it claims. Ibid.
>
> …. As for the major questions doctrine "label[]," … it took hold because it refers to an identifiable body of law that has developed over a series of significant cases all addressing a particular and recurring problem: agencies asserting highly consequential power beyond what Congress could reasonably be understood to have granted. Scholars and jurists have recognized the common threads between those decisions. So have we. *See Utility Air*, 573 U. S., at 324 (citing *Brown & Williamson* and *MCI*); *King v. Burwell*, 576 U. S. 473, 486 (2015) (citing *Utility Air, Brown & Williamson*, and *Gonzales*).

65. The New York City Congestion Pricing Plan constitutes a Major Question subject to this Doctrine.

66. The Plan involves a dramatic transformation of the heart of Manhattan, will severely impact thousands of people both initially and over the years, and is specifically intended to force by economic pressure residents of the surrounding metropolitan areas to avoid driving into the very large CBD. The CBD includes all of Midtown and Lower Manhattan, inclusive of Wall Street and the Financial District. Its central importance to the United States economy cannot be overstated.

67. As shown, thousands of Town of Hempstead residents regularly commute and drive by car to the CBD for work, healthcare, shopping, and recreation, many of whom—because

of disability, age, safety, need for a vehicle within the CBD, and other reasons—have no feasible alternative to driving.

68. The ISTEA's VPPP, as amended, does not satisfy the Major Question Doctrine.

69. The terse VPPP enabling statute leaves completely undefined what it means by "value pricing pilot programs."

70. Nothing in it suggested that a zone-based congestion pricing program, or a program as massive as the Plan, was envisioned.

71. FHWA's past indication that it may authorize the Plan through the VPPP represents an extreme expansion of administrative authority not in keeping with separation of powers principles. See FHWA's website for VPP Program, Projects Involving Tolls, at, *Zone-Based Pricing, including Cordon and Area Pricing Quarterly Reports*, explaining that no zone-based tolling project of any size has ever been approved for the VPPP, let alone one as large-scale as the Plan here.

72. Moreover, the law's limited text indicates it is to be used as a "pilot" program, not a means of implementing a massive scheme to transform one of America's largest cities.

73. The fact that Congress has for years de-funded the VPPP further reflects that it is not a broad enough authorization for the major Plan involved here.

74. Additionally, the types of projects which FHWA has previously admitted into the VPPP have generally been modest ones, that are nowhere near in scope or impact as the Plan here. See FHWA's website for VPP Program, at *Project Examples*.

75. By reason of the foregoing, a controversy exists between the Town on the one hand and the FHWA, the TBTA and the MTA on the other, regarding whether the VPPP can be used to authorize the Plan as required under federal law, whether the Plan otherwise constitutes a

major question under the Major Question Doctrine, and whether FHWA cannot approve or has unlawfully approved the Plan without new congressional approval.

76. By Letter-Petition dated February 22, 2024, the Town requested from the FHWA a declaratory order pursuant to 5 U.S.C. § 554(e), declaring that the FHWA does not possess authority to authorize the Plan under the Value Pricing Pilot Program, and that further authority from Congress is required before the Plan may be implemented.

77. The FHWA has failed to act on the Letter-Petition.

78. FHWA has in the past indicated it will generally not issue declaratory orders.

79. The Court should accordingly issue a declaratory judgment declaring that the VPPP cannot be used to authorize the Plan, any past approval of the Plan was unlawful, the Plan otherwise constitutes a major question under the Major Question Doctrine, the FHWA cannot approve the Plan without new congressional approval, the Plan is not authorized by federal law and violates 23 U.S.C. § 301 and other laws, and otherwise declaring the rights and responsibilities of the parties.

80. The Court should also issue a permanent injunction against Defendants' implementation of the Plan under the VPPP and without new congressional approval.

## SECOND CLAIM FOR RELIEF

81. The Town repeats and realleges each of the foregoing allegations.

82. The congestion pricing toll is not legal.

83. The congestion pricing toll does not apply fairly and equally to all persons availing themselves of the public roadways in the CBD of Manhattan.

84. People who garage their vehicles outside the CBD, and thus, whose trips originate outside the CBD, will by necessity be required to pay a toll to enter the CBD.

85. The same toll is to be charged regardless of the distance traveled or the amount of time spent traveling within the CBD.

86. To the contrary, those who garage their vehicles inside the CBD, and thus, whose trips originate inside the CBD, will be free to drive about the CBD without the necessity of paying any toll no matter how far that vehicle may drive while in the CBD.

87. The tolling plan is intended to be a penalty to divert drivers to use public transportation.

88. The class of persons to be tolled is the population of vehicle owners who drive vehicles in the CBD.

89. The toll is only charged for crossing into the CBD, not for using the roadways in the CBD.

90. Therefore, a person is charged the same toll regardless of whether that person drives a single block in the CBD or drives thousands of miles in the CBD.

91. The tolling plan, for the reasons set forth above, does not fairly and equally target the intended class, all persons driving within the CBD, to reduce congestion.

92. The announced ill to be cured is the reduction of congestion on CBD roadways. Punishing residents and drivers who live outside of the CBD area with this toll is not reasonably related to the tolling plan where residents and drivers who live in the CBD are free to cause unlimited congestion without paying the penalizing toll.

93. There is no rational basis for discriminating in favor of the group of people garaging vehicles in the CBD versus the group of people who garage their vehicles outside the CBD.

94. Charging the toll to a person whose trip originates outside the CBD regardless of how much that person may contribute to road congestion, but having no means to charge a person whose trip originates inside the CBD, even if that trip may add substantially to congestion is a violation of the right to equal protection of the laws.

95. There is no rational relationship between the charge made against the driver and the service provided by the government.

96. The toll is not rationally related to a legitimate governmental interest.

97. By virtue of the foregoing, pursuant to 42 U.S.C. § 1983, the New York State and U.S. Constitutions, the Court should issue a declaratory judgment declaring that the toll under the Plan violates the Equal Protection and Due Process Clauses of the New York State and U.S. Constitutions, and should issue a permanent injunction enjoining the TBTA/MTA from charging that toll and enjoining the FHWA from authorizing it.

## THIRD CLAIM FOR RELIEF

98. The Town repeats and realleges each of the foregoing allegations.

99. The congestion pricing toll is, as a matter of law, an unauthorized tax.

100. The TBTA is not statutorily or constitutionally authorized to charge a tax.

101. In the absence of such State statutory or constitutional authority, the TBTA may not levy a tax.

102. Pursuant to the New York State Constitution, only the State Legislature may authorize a tax. N.Y. Const. Art. 16, § 1.

103. Pursuant to NYS Public Authorities Law § 553(12-a), "all tolls, fees and other revenues derived from the central business district tolling program shall be applied to the payment of operating, administration, and other necessary expenses of the authority properly

allocable to such program, including the capital costs of such program, and to the payment of interest or principal of bonds, notes or other obligations of the authority or the metropolitan transportation authority issued for transit and commuter projects . . ."

104. N.Y. Const. art. 16, § 1 provides, "The power of taxation shall never be surrendered, suspended or contracted away…. Any laws which delegate the taxing power shall specify the types of taxes which may be imposed thereunder and provide for their review."

105. "To prevent local usurpation of the taxing power, such delegation [under N.Y. Const. art. 16, § 1] must specify the types of taxes which may be imposed and provide for some type of administrative or judicial review." Greater Poughkeepsie Library Dist. v. Town of Poughkeepsie, 81 N.Y.2d 574, 580 (1993).

106. "The power to tax may not, however, be delegated to administrative agencies or other governmental departments" (Greater Poughkeepsie Library) and the TBTA and the MTA are not among the entities whom the New York State Constitution allows to be delegated taxing authorities. See N.Y. Const. art. 8, § 3; see also Greater Poughkeepsie Library.

107. As a matter of law, the toll is a tax because the toll amount is regulated by Defendants' necessities in providing services to the public—not the cost any individual places upon the government in exchange for government services.

108. The congestion toll is in no way related to the volume and use an individual places on the roadways in the CBD.

109. The charges to the driving public under the Plan are to support the operation and capital expenditures of the entire Integrated Travel Network (ITN) operated, managed, maintained, and funded by the TBTA and MTA.

110. The charge also is the same regardless of how much a given person adds to congestion on any given day, and thus, it cannot be considered a toll, which must possess a fair approximation of use or privilege for use.

111. No tax was authorized by the CBD-enabling legislation.

112. The CBD-enabling legislation did not specify the types of taxes which may be imposed and did not provide for some type of administrative or judicial review.

113. The tax is not charged to similarly situated individuals, that group being all individuals driving in the CBD.

114. No part of this tax is charged to persons who garage their vehicles in the CBD and drive only within the CBD.

115. Persons driving in the CBD are not being treated uniformly.

116. By virtue of the foregoing, the Court should issue a declaratory judgment declaring that the toll under the Plan is an unauthorized tax, and should issue a permanent injunction enjoining the TBTA/MTA from charging that toll/tax and enjoining the FHWA from authorizing it.

**FOURTH CLAIM FOR RELIEF**

117. The Town repeats and realleges each of the foregoing allegations.

118. The toll or tax to be levied by the TBTA and MTA violates the Eighth Amendment prohibition against excessive fines.

119. The toll or tax to be levied by the TBTA and MTA is intended to punish drivers and their vehicles for entering the CBD.

120. Unlike tolls on bridges or highways, the primary purpose of the toll here is not to maintain the roadways in the area of the toll, but merely to deter use of roadways in the CBD for

the purpose of collecting revenue to spend on general governmental projects across a region that extends 75 to 80 miles from the center of the CBD.

121. The toll is grossly disproportionate to the activity being deterred.

122. The nature and extent of the matters being deterred are defined by the TBTA and MTA as operating a motor vehicle for any distance in the CBD.

123. The alleged harms caused by an individual's vehicle operating in the CBD, including slow traffic and decreased air quality, is nominal.

124. The deterrent toll or tax is grossly disproportionate to the offense of legally driving in the CBD, and is even more grossly disproportionate whenever the driving within the CBD is minimal.

125. By virtue of the foregoing, pursuant to 42 U.S.C. § 1983 and the U.S. Constitution, the Court should issue a declaratory judgment declaring that the toll under the Plan constitutes an excessive fine in violation of the Eighth Amendment, and should issue a permanent injunction enjoining the TBTA/MTA from charging that toll and enjoining the FHWA from authorizing it.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs hereby requests Judgment:

1. Upon the First Claim for Relief, (a) a declaratory judgment declaring that the VPPP cannot be used to authorize the Plan, any past approval of the Plan was unlawful, the Plan otherwise constitutes a major question under the Major Question Doctrine, the FHWA cannot approve the Plan without new congressional approval, the Plan is not authorized by federal law and violates 23 U.S.C. § 301 and other laws, and otherwise declaring the rights and responsibilities of the parties; and (b) a permanent injunction against Defendants' implementation of the Plan under the VPPP and without new congressional approval;

2. Upon the Second Claim for Relief, pursuant to 42 U.S.C. § 1983, the New York State and U.S. Constitutions, (a) a declaratory judgment declaring that the toll under the Plan violates the Equal Protection and Due Process Clauses of the New York State and U.S.

Constitutions, and (b) a permanent injunction enjoining the TBTA/MTA from charging that toll and enjoining the FHWA from authorizing it;

3. Upon the Third Claim for Relief, (a) a declaratory judgment declaring that the toll under the Plan is an unauthorized tax, and (b) a permanent injunction enjoining the TBTA/MTA from charging that toll/tax and enjoining the FHWA from authorizing it;

4. Upon the Fourth Claim for Relief, pursuant to 42 U.S.C. § 1983 and the U.S. Constitution, (a) a declaratory judgment declaring that the toll under the Plan constitutes an excessive fine in violation of the Eighth Amendment, and (b) a permanent injunction enjoining the TBTA/MTA from charging that toll and enjoining the FHWA from authorizing it; and

5. Granting Plaintiffs such other and further relief as the Court deems just and equitable.

Dated: Garden City, New York
May 1, 2024

Respectfully submitted,

**ROSENBERG CALICA & BIRNEY LLP**

By: _____
Judah Serfaty
Joshua M. Liebman
*Attorneys for Plaintiffs*
100 Garden City Plaza, Suite 408
Garden City, New York 11530
(516) 747-7400